# EX. 1

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made and entered on MAY 21, 2012, by and between Robert Haley, an individual resident of the State of Massachusetts (the "Employee"), and Fabreeka International Holdings, Inc., a Massachusetts corporation (the "Company"), to be effective as of the First Effective Date and the Second Effective Date pursuant to the terms below.

### WITNESSETH:

**WHEREAS**, the parties hereto desire to enter into this Agreement for the employment of the Employee by the Company on the terms and conditions hereinafter stated;

**WHEREAS**, pursuant to the terms of the certain Stock Purchase Agreement currently being negotiated (the "Purchase Agreement"), by and among Fabreeka Group Holdings, Inc. (the "Parent"), Kaydon Corporation and certain other parties thereto, Kaydon Corporation will agree to purchase all of the outstanding capital stock of the Parent (of which the Company is a wholly-owned subsidiary); and

**WHEREAS**, the Purchase Agreement requires that the Employee and the Company enter into this Agreement as a condition to the signing of the Purchase Agreement and that this Agreement continue to be in full force and effect as of the date of the closing of the transactions contemplated in the Purchase Agreement.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements contained herein and the continued employment of the Employee by the Company, the salary, pay raises and promotional opportunities, and other benefits received by the Employee and in consideration of being given access to confidential and proprietary information when required, and with the intent to be legally bound hereby, the parties hereto agree as follows:

1. **Effective Date; Term of Employment.**

    (a) **Effective Date.** The Employee's employment under this Agreement shall commence, and all of the provisions of this Agreement (excluding Sections 1(b), 2, 3, and 4) shall be effective, as of the date hereof (the "First Effective Date"). Sections 1(b), 2, 3 and 4 of this Agreement shall be effective, and are expressly contingent upon, the date of the closing of the transactions contemplated in the Purchase Agreement (the "Second Effective Date"). If the negotiations regarding the Purchase Agreement terminate or the Purchase Agreement is terminated at any time prior to the Second Effective Date, this Agreement shall immediately terminate and be of no further force or effect and, notwithstanding anything to the contrary herein, neither party shall have any further obligations with respect hereto.

    (b) **Term of Employment.** The Employee's employment under this Agreement (the "Term") shall continue as of the Second Effective Date and shall end on the second (2nd) anniversary of the Second Effective Date or such earlier date on which the

Employee's employment is terminated pursuant to the terms of Section 4 of this Agreement. The date on which this Agreement expires or is terminated pursuant to Section 4 of this Agreement shall be the "Expiration Date." If the Company continues to employ the Employee beyond the Expiration Date without entering into a written agreement extending the term of this Agreement, except as provided in a new written employment agreement between the Company and the Employee, all obligations and rights under this Agreement shall expire as of the Expiration Date, except the Employee's confidentiality, non-solicitation, non-competition, inventions assignment and other obligations pursuant to the terms of Section 5 and Section 6.

2. **Nature of Duties**. The Employee shall be employed by the Company and shall report to a senior manager of the Company and any successor designated by the board of directors of the Company (the "Supervisor"). The Employee shall work exclusively for the Company and/or its affiliates and shall have all of the customary powers and duties associated with the position to which he is assigned from time to time and such other and further duties as the Supervisor shall assign from time to time. The Employee shall devote all of the Employee's business time, attention, and energies to the Company and its affiliates. The Employee shall be subject to and abide by the policies and procedures of the Company as generally in effect from time to time.

3. **Compensation and Related Matters**.

(a) **Base Salary**. The Company shall pay the Employee a base salary in conformity with the Company's salary payment practices at an annual rate of $73,034.16, less customary withholdings (the "Base Salary"), subject to annual merit increases at the Company's sole discretion.

(b) **Bonuses and Commissions**. The Employee will be eligible to participate in the Company's bonus and commission programs in effect immediately prior to the Second Effective Date for his employment during 2012. In each year of the Term following 2012, the Employee will be eligible to participate in the Kaydon Incentive Compensation Bonus Plan and a performance-based commission program comparable to the program in effect at the Company immediately prior to the Second Effective Date.

(c) **Standard Benefits**. During the Employee's employment, the Employee shall be entitled to participate in all employee benefit plans and programs offered by the Company to the same extent generally available to other similarly situated Company employees, in accordance with the terms of those plans and programs. The Company shall have the right to terminate or change any such plan or program at any time.

(d) **Restricted Stock Awards**. Upon the Second Effective Date, the Employee shall receive 3,700 shares of restricted stock of Kaydon Corporation pursuant to the terms of the Kaydon Corporation 1999 Long Term Stock Incentive Plan and a Restricted Stock Award Agreement between the Employee and Kaydon Corporation.

4. **Termination**.

(a) **Rights and Duties**. If the Employee's employment is terminated, the Company and the Employee shall have no further obligations to each other, except the

Company's payment obligations under this Section 4 and the Employee's confidentiality, non-solicitation, non-competition, inventions assignment and other obligations pursuant to the terms of Section 5 and Section 6.

(b) **Death or Disability**. The Employee's employment shall terminate immediately upon the Employee's death or Disability (except as prohibited by applicable law). For purposes of this Agreement, "Disability" shall have the meaning assigned to such term by the Company's long-term disability plan or policy applicable to the Employee. If the Employee's employment is terminated by reason of the Employee's death or Disability, the Company shall have no further obligation to the Employee or the Employee's estate, beneficiaries, or legal representatives.

(c) **By the Company without Cause**. The Company may terminate the Employee's employment without Cause for any reason and at any time. In the event of a termination by the Company without Cause (as defined below), the Company shall have no further obligation to the Employee except for (i) the payment to the Employee of the portion of the Employee's unpaid Base Salary (less any applicable withholdings) through the date of termination, (ii) a severance payment of an amount equal to the greater of (A) the Employee's Base Salary payable through the end of the Term (less any applicable withholdings), plus an amount equal to 1/12 of the average commission payable to Employee over the most recent three-year fiscal period for each full or partial month remaining through the end of the Term (less any applicable withholdings); or (B) six (6) months of the Employee's then-current Base Salary (less any applicable withholdings), plus an amount equal to fifty percent (50%) of the average commission payable to Employee over the most recent three-year fiscal period following the Employee's termination of employment (the "Severance Payment"), and (iii) as may otherwise be set forth in any Company benefit plan or program applicable to the Employee, including any accrued but unused vacation pursuant to the Company's vacation policy. As a condition to receiving any Severance Payment hereunder, the Employee shall execute and deliver a general release of all claims against the Company and its affiliates, stockholders, officers, and directors arising out of this Agreement or the Employee's employment hereunder (except for the payments described above) in a form acceptable to the Company (the "Release") no later than sixty (60) days following the Employee's termination of employment. The Company shall pay the Employee such Severance Payment in installments equal to the Employee's regular Base Salary amount paid each pay period, with the final installment being equal to the balance of Severance Payment due, payable on each regular Company payroll date.

(d) **By the Company for Cause**. The Company may terminate the Employee's employment for Cause at any time. If the Employee is terminated by the Company for Cause, the Company shall have no further obligation to the Employee except for the payment of any unpaid Base Salary (less any applicable withholdings) through the date of termination and as may otherwise be set forth in any Company benefit plan or program applicable to the Employee, including any accrued but unused vacation pursuant to the Company's vacation policy. For purposes of this Agreement, "Cause" shall mean the Employee's:

(i) indictment for, or conviction of, a felony, a crime involving theft, fraud, dishonesty or moral turpitude, or any violation of any federal or state securities law (whether by plea of *nolo contendere* or otherwise) or the Employee's

enjoinment from violating any federal or state securities law or being determined to have violated any such law;

(ii) refusal to follow the Company's lawful directions or the Employee's material failure to perform the Employee's duties (other than by reason of physical or mental illness, injury, or condition), in either case, after the Employee has been given written notice of the Employee's default and has failed to cure such default within five (5) business days of the Employee's receipt of such written notice;

(iii) engaging in conduct constituting embezzlement, willful assistance to a competitor, fraud, misappropriation, material violation of the Company's anti-discrimination, equal employment opportunity, prohibition against harassment or similar policies or material violation of the Company's insider trading policy, corporate code of business conduct and ethics or other material policy;

(iv) failure (including, but not limited to, the Employee's refusal to be deposed or to provide testimony at any trial or inquiry) to cooperate, if requested by the board of directors of the Company or the Supervisor, with any investigation or inquiry, whether internal or external, into the Employee's actions (or inactions) or the Company's business practices;

(v) possession on Company premises of any prohibited drug or substance that constitutes a criminal offense;

(vi) gross misconduct or gross negligence in connection with the business of the Company or any affiliate;

(vii) public conduct by the Employee that in the good faith opinion of the board of directors of the Company harms the Employee's or the Company's reputation or standing in the community; or

(viii) material breach of this Agreement, including of any obligation of the Employee under Section 5 or Section 6.

(e) **By the Employee Voluntarily.** The Employee may terminate this Agreement upon four (4) weeks prior written notice to the Company. If the Employee voluntarily terminates this Agreement, the Company shall have no further obligation to the Employee except for the payment of any unpaid Base Salary through the date of termination and as may otherwise be set forth in any Company benefit plan or program applicable to the Employee, including any accrued but unused vacation pursuant to the Company's vacation policy.

(f) **Set-Off of Amounts Owed to the Company.** Any amounts payable to the Employee under this Section 4 shall first be set-off against any amounts the Employee owes the Company.

(g) **Section 409A.** Notwithstanding anything in this Section 4 to the contrary, if any benefit or amount payable to the Employee under this Section 4 on account of

the Employee's termination of employment constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Internal Revenue Code, as amended (the "Code") the set-off clause in Section 4(f) shall not apply and payment of such benefit or amount shall commence when the Employee incurs a "separation of service" within the meaning of Treasury Regulation Section 1.409A-1(h), (i.e., the Company and the Employee reasonably anticipate that the Employee shall perform no further services for the Company or any entity that would be considered a single employer with the Company or that the level of bona fide services the Employee will perform in the future will permanently decrease to no more than 20 percent of the average level of bona fide services performed (over the immediately preceding 36-month period). If, at the time the Employee incurs a separation from service, the Employee is a "specified employee" within the meaning of Code Section 409A, any benefit or amount payable to the Employee under this Section 4 on account of the Employee's termination of employment that constitutes nonqualified deferred compensation subject to 409A shall be delayed until the first day of the seventh month following the Employee's separation from service (the "409A Suspension Period"). Within fourteen calendar days after the end of the 409A Suspension Period, the Company shall pay to the Employee (or his estate or beneficiary, as applicable) a lump sum payment in cash equal to any payments and benefits that the Company would otherwise have been required to provide under this Section 4 but for the imposition of the 409A Suspension Period. Thereafter, the Employee shall receive any remaining payments and benefits due under this Section 4 in accordance with the terms of this section (as if there had not been any suspension period beforehand).

5. **Confidentiality, Non-Competition and Non-Solicitation Obligations.**

(a) **Acknowledgments.** The Employee acknowledges and agrees that the Company and its affiliates (collectively, the "Group") currently conduct the business of designing, manufacturing, marketing and selling vibration and shock control products (the "Business"). The Employee further acknowledges and agrees that, in the Employee's position with the Company, the Employee will be responsible for: (i) actively conducting the Business, (ii) overseeing Company activities, (iii) developing and implementing strategies on behalf of the Company everywhere the Group currently conducts the Business, and (iv) affecting customers, suppliers, and distributors everywhere the Group currently conducts the Business. The Employee also acknowledges that (A) the basis of the Group's success resides in its employees and the technology and related information which they generate, (B) the continued growth of the Group depends on its ability to maintain its competitive edge which not only requires the generation of new technology but equally the protection of its existing technology, (C) the Group has developed expertise and generated Confidential Information (as defined below) in the manner in which the Group conducts its business, (D) the Employee will become or has been exposed to certain private, proprietary and Confidential Information relating to the Group's business, equipment, products, services, processes and developments, and (E) the Employee may have or may in the future contribute toward the development of new equipment, products, services, processes and/or developments while employed by the Company. To protect the Group's business interests, including its Confidential Information and business relationships, the Employee accepts and agrees to the terms of this Section 5 and Section 6.

(b) **Non-Disclosure of Confidential Information.** The relationship with the Group has been and/or will be one of trust and confidence and there has been and/or will

be available to the Employee certain confidential, private and proprietary business and financial information, trade secrets, private business and financial matters, and proprietary interests of the Group which include, but may not be limited to, the records of the Group dealing with sales, income, customers, customer lists, services, products, prices, computer programs, research, inventions, and other items relative thereto (herein collectively and individually referred to as the "Confidential Information"). The Employee hereby acknowledges and agrees that the Confidential Information is extremely valuable and an important asset of the Group and the unauthorized use and/or disclosure of the Confidential Information will cause irreparable economic and business injury to the Group. The Employee shall hold the Confidential Information in strict confidence and in trust for the Group and shall not disclose or otherwise communicate, provide or reveal in any manner whatsoever any of the Confidential Information to any person or entity without the prior written consent of the Company, which consent may be withheld for any reason whatsoever, in the sole discretion of the Company. The Employee shall hold in trust the Confidential Information and use the same for the sole and exclusive benefit of the Group.

(c) **Return.** Upon termination of the employment relationship between the Employee and the Company, the Employee shall immediately return to the Company, without demand from the Company, and the Employee shall not retain, any Confidential Information disclosed or provided to the Employee, including, but not limited to, all originals, copies, reproductions, notes, facsimiles, samples, models and products thereof. The return of the Confidential Information shall also include but not be limited to the return of the following items to the Company immediately upon the termination of the employment relationship between the Employee and the Company: automobile, keys, computers, computer programs, documents, customer lists, addresses, telephone numbers, computer discs, notebooks, drawings, blueprints, manuals, software, hardware, PDA's, telephones, access cards and such or all other recorded, written, printed, and/or electronic materials, information, and supplies relating to the business of the Group.

(d) **Ownership.** The Employee acknowledges that the Confidential Information, regardless of form, is, and shall always remain, the sole and exclusive property of the Group. The Employee also acknowledges that the Employee has no ownership interests in and/or to, and/or any rights to have or to use, the Confidential Information.

(e) **Non-Competition and Non-Solicitation Restrictive Covenants.**

(i) For purposes of this Agreement, (i) the term "Competitor" means any individual, corporation or enterprise who or which manufactures, distributes and/or sells a product or renders a service of substantially the same kind or nature as any product or service which was manufactured, provided, distributed, sold or developed (and/or actively considered for development) by the Group, and (ii) the term "Related Work" means job duties or functions that are the same as or substantially similar to the Employee's duties with the Company during the thirty six (36) month period immediately preceding the termination of the Employee's employment with the Company.

(ii) During the course of the Employee's employment by the Company and for a period of twelve (12) months following the termination of the Employee's

employment with the Company for any reason, the Employee shall not perform Related Work for a Competitor within any geographic area in which the Employee worked, any geographic area over which the Employee had responsibility, or any geographic areas in which customers or clients serviced by the Employee were located.

(iii) During the course of the Employee's employment by the Company and for a period of twelve (12) months following the termination of the Employee's employment with the Company for any reason, the Employee shall not, without the prior written consent of the Company, either directly or indirectly, on the Employee's own behalf or in the service or on behalf of others, solicit, or attempt to divert or appropriate to a Competitor, any customer or prospective customer of the Group with whom the Employee has dealt on behalf of the Group at any time during the twelve (12) months immediately preceding the termination of the Employee's employment.

(iv) During the course of the Employee's employment with the Company and for a period of twelve (12) months following the termination of the Employee's employment with the Company for any reason, the Employee shall not directly or indirectly recruit, solicit or otherwise induce or influence any employee or sales agent of the Group to discontinue such employment or agency relationship with the Group and shall not, either directly or indirectly, recruit, solicit or otherwise induce any supplier to terminate any association with the Group or purchase goods or services which compete with the Group.

(f) **Remedies; Enforceability**. The Employee acknowledges and agrees that in the event any of the covenants described herein is found unenforceable for any reason, such a finding will have no impact on the enforceability of the remaining covenants. The Employee acknowledges and agrees that the restrictive covenants set forth herein are fair, reasonable and necessary to protect the Group's legitimate business interest and hereby waives any defense on such basis. The Employee further acknowledges and agrees that if the Employee were to breach or threaten to breach the restrictive covenants listed herein, the Company would be irreparably harmed such that it would not be possible to calculate the full measure of the Company's injury, and the Company would not have an adequate remedy at law. Therefore, the Employee acknowledges and agrees that temporary and permanent injunctive relief would be appropriate remedies if the Employee breaches this Agreement; provided that these equitable remedies are not exclusive and in no manner limit the Company's other remedies, including money damages and attorneys' fees. Further, the Employee acknowledges and agrees that the Employee's agreement hereto is a condition of continued employment with the Company and that such continued employment is of substantial value to the Employee and is good and valuable consideration in return for the Employee's agreement to the restrictive covenants contained herein.

(g) Accordingly, the Employee acknowledges and agrees that if the Employee violates or threatens to violate any covenant or agreement made by the Employee in this Section 5 or Section 6 (a "Violation"):

(i) the Company may terminate the Employee's employment immediately and if such Violation occurs after the Second Effective Date, such termination shall be for Cause;

(ii) all payments and benefits otherwise owing to the Employee shall immediately cease and be considered forfeited, and the Employee shall have no further entitlement to such payments or benefits except for the payment of any unpaid Base Salary through the date of termination of employment;

(iii) the Company shall have the right and remedy to require the Employee to account for and pay over to the Company all compensation, profits, monies, accruals, increments, or other benefits (collectively, "Benefits") derived or received by the Employee as the result of any transactions constituting a breach of any of the provisions of this Section 5 or Section 6, and the Employee shall account for and pay over such Benefits to the Company;

(iv) the Company will be entitled to, in addition to and without limiting any other remedies available to it, an injunction to be issued by any court of competent jurisdiction restraining the Employee from committing or continuing any such violation, without the need to prove the inadequacy of money damages or to post any bond or to make any other undertaking; and

(v) the Company shall be entitled to recover from the Employee the reasonable costs, including attorneys' fees, it incurs in pursuing legal action to enforce this Section 5 and Section 6, but only if that legal action results in a money judgment, temporary restraining order, or injunction against the Employee.

Each of the rights and remedies enumerated above shall be independent of the other, and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity.

(h) **Survival**. This Section 5 and Section 6, and the promises and agreements the Employee made in this Section 5 and Section 6, shall survive the end of the Employee's employment and the termination of this Agreement for any reason.

6. **Intangible Property**.

(a) **Ownership**. All ideas, inventions, discoveries, improvements, patents, copyrights in work of authorship, trademarks, service marks, trade names, software, programs, codes, design specifications, materials, processes, procedures, and trade secrets, including those informative stages, whether patentable or not, made by the Employee solely or jointly with others while employed by the Company relative to the business, trade, activities, processes, products, services, developments, computer programs, research or interests of the Group or which result from or relate to the subject matter of any work which the Employee may perform for and on behalf of the Group, whether on or off the Group's premises, and whether during or after usual working hours (collectively and individually, the "Intangible Property") shall be the sole and exclusive property of the Group.

(b) **Assignment**. So as to eliminate any doubt as to the exclusive ownership and use of the Intangible Property by the Group, the Employee hereby (i) assigns, gives and transfers to the Group all rights, title and interests in and to the Intangible Property the

Employee may currently have, if any, and (ii) waives and disclaims in favor of the Group any rights or interests in and/or to the Intangible Property that the Employee may have, if any.

(c) **Records**. The Employee shall maintain accurate and compete written records and promptly, upon request, disclose to the Group all such Intangible Property made by the Employee alone or jointly with others.

(d) **Presumption of Ownership**. All Intangible Property, which the Employee claims to have conceived, solely or jointly, which relates to the business of the Group or the Group's actual or demonstrably anticipated research or development or which results from any work performed by the Employee shall be presumed to have been made during such employment unless the Employee clearly and convincingly proves otherwise.

(e) **Future Obligations**. At the Group's expense, the Employee or his legal representative, shall immediately (i) assign and convey to the Group all of the Employee's right and interest in and to the Intangible Property developed during the Employee's employment with the Group, if any; (ii) assist the Group and its agents in repairing documents for the protection of intellectual property rights, including, but not limited to, powers of attorney, affidavits, patent application and copyright registrations in all countries in the world relating to the same; (iii) sign and deliver to the Group all papers thereto including assignments of patent applications and patents; and (iv) give all information and testimony, sign all papers and do all things whatsoever which may be reasonably requested by the Company to obtain, extend, reissue, maintain or enforce such intellectual property rights.

7. **Notices**. All notices, communications and deliveries required or made hereunder must be made in writing signed by or on behalf of the party making the same, shall specify the section hereunder pursuant to which it is given or being made, and shall be delivered personally, by facsimile transmission (with a copy delivered by a nationally-recognized carrier or US mail upon or promptly following such email or facsimile transmission) or by a national overnight courier service or by registered or certified mail (return receipt requested) (with postage and other fees prepaid) as follows:

If to the Company, to:

> Fabreeka International Holdings, Inc.
> c/o Kaydon Corporation
> 315 E. Eisenhower Parkway
> Ann Arbor, Michigan 48108
> Attention: General Counsel
> Facsimile: [_____]

If to the Employee, to the Employee at the Employee's address or facsimile number as then on file with the Company's Human Resources Department.

8. **Amendment**. No provisions of this Agreement may be modified, waived, or discharged except by a written document signed by the Chief Executive Officer of Kaydon Corporation, a duly authorized Company officer and the Employee. A waiver of any conditions

or provisions of this Agreement in a given instance shall not be deemed a waiver of such conditions or provisions at any other time.

9. **Dispute Resolution.** Except with respect to the equitable enforcement of the terms of this Agreement, the Company and the Employee shall arbitrate any and all disputes arising out of this Agreement through the procedures and policies of the American Arbitration Association, unless other procedures are agreed upon in writing between the Company and the Employee. The determination of the arbitrator shall be binding and final upon the Company and the Employee. The award of the arbitrator must be filed with the Clerk of the appropriate court in the county and state where Kaydon Corporation is physically located and judgment may be rendered by such court upon the arbitration award and execution may be issued upon the judgment.

10. **Controlling Law; Jurisdiction.** This Agreement shall be governed by and in accordance with the laws of the United States of America and the State of Michigan. In the event of a dispute hereunder, the parties agree that the exclusive jurisdiction and venue for the resolution thereof shall be the County of Washtenaw, State of Michigan.

11. **Acceptance.** The Employee has read this Agreement carefully and understands and accepts it. The Employee understands and accepts that this Agreement is also binding upon his/her heirs, executors, administrators, legal representatives or assigns.

12. **Validity.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

13. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute the same instrument.

14. **Section Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

15. **Affiliates.** As used herein, the term "affiliate" shall mean and include any corporation or other business entity directly or indirectly controlling, controlled by or under common control with the Company or other business entity in question.

16. **Entire Agreement.** This Agreement represents the entire and integrated agreement between the Company and the Employee regarding the issues addressed herein, and supersedes and cancels any prior or contemporaneous arrangements, understandings or agreements, whether written or oral, by and between the Company and the Employee relative to the subject matter hereof. Any amendments hereto shall be in writing and executed by the Company and the Employee.

The Employee acknowledges and agrees that all understandings and agreements between the Company and the Employee relating to the subjects covered in this Agreement are contained herein and that the Employee has entered into this Agreement voluntarily and not in reliance on any promises or representations by the Company other than those contained in this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

FABREEKA INTERNATIONAL HOLDINGS, INC.

By: _____
Name: Daniel R Park
Title: VP

EMPLOYEE

By: _____
Name: Robert Haley

THE FOLLOWING ARE THE ONLY INVENTIONS, IMPROVEMENTS OR DISCOVERIES WHICH THE EMPLOYEE OWNS, OR ARE THE ONLY AGREEMENTS OR OBLIGATIONS TO WHICH THE EMPLOYEE IS A PARTY, WHICH MAY BE IN CONFLICT WITH OBLIGATIONS UNDERTAKEN ABOVE:

_____
_____
_____
_____
_____
_____